IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAMELA KEYSER,                                         Case No. 6:13-cv-02031-SB

          Plaintiff,                              **FINDINGS AND**
**RECOMMENDATION**

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

BECKERMAN, Magistrate Judge.

      Pamela Keyser ("Keyser") appeals the Commissioner of the Social Security Administration's ("Commissioner" or "SSA") denial of her application for social security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g), and, for the reasons explained below, the Court recommends that the Commissioner's decision be reversed and remanded for an immediate award of benefits.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Keyser began working in retail as a cashier-checker in the early 1980s. Keyser worked in that same capacity in Fred Meyer's home fashion department from November 20, 1997, through October 31, 2005. Keyser now asserts that she is disabled based on combined impairments, including bullous emphysema, bipolar disorder, depression, and anxiety. Keyser alleges that her disability began on October 31, 2005, when her right lung collapsed and had to be surgically repaired. Keyser spent eight days in the hospital following her surgery. The treatment notes prepared by Keyser's attending physician at that time indicated that the recurrence rate of a collapsed lung was as high as thirty percent or above. The attending physician spoke with Keyser at the time of her November 8, 2005, discharge from the hospital. He explained the risk of recurrence, and warned Keyser that another collapsed lung could "be potentially life-threatening." (Tr. 203.)

On November 22, 2005, Keyser filed an application for disability insurance benefits. Roughly one month later, on December 28, 2005, Keyser completed a Claimant Fatigue Questionnaire. Keyser stated that she: (1) began experiencing fatigue after her right lung collapsed; (2) requires two or three one-hour naps per day; (3) requires rest between activities due to emphysema and her recent lung injury; (4) shops on a monthly basis and cleans, cooks, and does laundry on a daily basis; (5) does not drive or socialize with friends; (6) needs rest after walking, sitting, or standing for less than an hour; (7) can bend and lift ten pounds occasionally and reach forward or upward rarely; and (8) experiences unspecified physical side effects from anti-depressants.

That same day, December 28, 2005, Keyser completed an Adult Function Report.[1]  Keyser described her typical day as consisting of waking up and taking her medications, having coffee and breakfast, lying down in bed, and performing light housework for short periods of time.  Keyser reported that depression and emphysema disrupt her everyday life (e.g., her ability to lift, bend, stand, reach, walk, sit, talk, concentrate, and get along with others), that her hobbies include reading, watching television, and listening to music, that she takes care of her husband, two sons (ages seventeen and twenty), and pets, that she has no difficulty in terms of personal care, and that she can handle money, pay bills, count change, handle a savings account, and use a checkbook.

On January 18, 2006, Keyser visited her primary care provider, Dr. Stephen Knapp ("Dr. Knapp"), regarding her emphysema, depression, and generalized anxiety disorder.  Keyser reported that she was feeling better despite continued mood swings.  Dr. Knapp advised Keyser that she could not return to work at Fred Meyer for another two months, and that there was a possibility she would never be able to return to work.  Dr. Knapp also noted during a prior consultation that Keyser was in the process of applying for social security disability benefits, and that he felt Keyser "certainly should qualify for" such benefits.  (Tr. 224.)

The next day, January 19, 2006, Keyser presented for a pain management consultation with Dr. Nancy Maloney ("Dr. Maloney").  Keyser described an achy chest which she rated as a seven on a ten-point scale.  Keyser reported that the pain caused her to avoid sleeping on her right side, have a reduced range of motion in her trunk, avoid lifting heavy objects, experience numbness along her right anterolateral chest wall, and avoid resistive pulling activities.  Dr. Maloney noted that

---

[1] Keyser's husband, John Keyser, also completed a Thirty-Party Adult Function Report on December 28, 2005.  John Keyser's report largely reflects the same information as Keyser's report.

Keyser was scheduled to begin chronic obstructive pulmonary disease rehabilitation by early February 2006.

On February 24, 2006, Dr. Frank Lahman ("Dr. Lahman"), a non-examining state agency psychologist, completed a Psychiatric Review Technique Form ("PRTF"), wherein he evaluated Keyser's impairments under listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).[2] Dr. Lahman concluded that the limitations imposed by Keyser's impairments failed to satisfy listings 12.04 or 12.06. Dr. Lahman noted that Keyser had not experienced any episodes of decompensation of an extended duration, and that she was mildly limited in terms of activities of daily living, social functioning, and concentration, persistence, or pace.

On February 27, 2006, Dr. Martin Lahr ("Dr. Lahr"), a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment ("PRFCA"). Dr. Lahr concluded that Keyser: (1) could lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) could stand, walk, and sit about six hours in an eight-hour workday; (3) could push and/or pull without limitation; and (4) had no postural, manipulative, visual, communicative, or environmental limitations.

On April 6, 2006, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency physician, completed a second PRFCA. Dr. Berner's PRFCA was identical to Dr. Lahr's in all respects with one exception. In terms of environmental limitations, Dr. Berner noted that Keyser should avoid even moderate exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc." (Tr. 296.)

---

[2] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

On May 18, 2006, Dr. Marc Jacobs ("Dr. Jacobs"), Keyser's pulmonologist, drafted a letter

to Keyser's counsel, which stated the following:

> Pamela Keyser is a patient of mine. She has underlying severe emphysema with
> significant exercise limitation. She has suffered from a spontaneous collapsed lung
> and has required surgery for repair. At this time, I do not believe she is going to be
> able to work with any kind of strenuous activity. She has a FEV1 in August 2005 of
> 70% of predicted.

(Tr. 305.)[3]

On June 2, 2006, Dr. Knapp (Keyser's primary care provider) also drafted a letter on

Keyser's behalf, which stated:

> Pam Kayser [sic] has been a patient of mine for some time. In the past year, she has
> been diagnosed with severe emphysema. Even though she is fairly young for this
> condition, she is clearly unable to perform any work because of it. She has already
> been hospitalized once, at which time she had to have a surgical procedure done for
> repair of an area of her lung that ruptured, which was dilated from having abnormal
> lung tissue; this is called a bleb. It took her a while to recover from that. While she
> continued to recover, she has been discovered to have several other spots that could
> do the same thing and require her to have other treatment.
>
> The patient has also been seeing a pulmonologist, Dr. Marc Jacobs, who should
> perhaps also be contacted regarding this matter.
>
> If you should have any other questions or concerns regarding this matter, please do
> not hesitate to contact me.

(Tr. 306.)

Dr. Knapp drafted a second letter on Keyser's behalf on November 15, 2006.  That letter

indicated that Keyser is suffering from severe depression, a generalized anxiety disorder, and

---

[3] "FEV1 is a measure of forced expiratory volume at one-second intervals." *Dahl v. Colvin*,
No. 12–cv–01552, 2014 WL 983514, at *2 n.2 (D. Colo. Mar. 12, 2014) (citation and quotation
marks omitted).  "FEV1 greater [than] 80% of predicted is normal; FEV1 60% to 79% of predicted
reflects mild obstruction; FEV1 40% to 59% of predicted reflects moderate obstruction; FEV1 less
than 40% of predicted reflects severe obstruction." *Duncan v. Comm'r of Soc. Sec.*, No.
2:13–cv–635, 2014 WL 4829469, at *6 n.2 (S.D. Ohio Sept. 29, 2014) (citation omitted).

chronic obstructive pulmonary disease or emphysema. (Tr. 307.) Dr. Knapp stated that Keyser "is basically unable to work due to the combination of these impairments." (Tr. 307.)

On December 27, 2006, the day after completing a pulmonary function test, Dr. Jacobs drafted a second letter on Keyser's behalf. In his second letter, Dr. Jacobs stated: "Pamela [Keyser] is a 49-year-old female with underlying bullous emphysema. . . . She is at risk for recurrent pneumothoraces based on her persistent bullous emphysema. Given the severity of her bullous emphysema and her [pre-bronchodilator] FEV1 of 46% of predicted, I would recommend disability."[4] (Tr. 312.)

On May 29, 2007, Keyser was examined by a psychiatrist, Dr. Anthony Monteverdi ("Dr. Monteverdi"),who prepared an Initial Psychiatric Assessment. Dr. Monteverdi's diagnoses included: bipolar disorder with manic episodes and some mild psychotic content and a history of polysubstance abuse (Axis I); some paranoid and schizotypal traits (Axis II); past medical issues related to a collapsed lung (Axis III); moderate social stressors (Axis IV); and a Global Assessment of Functioning ("GAF") score of 55 to 65.[5]

---

[4] A "pneumothorax" is commonly referred to as a collapsed lung. *Urban v. United States*, 98 Fed. Cl. 327, 328 (Fed. Cl. 2011).

[5] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). A GAF of 55 to 65 indicates mild to moderate symptoms. *Parsons v. Colvin*, No. 3:12–cv–00083–HU, 2013 WL 5310265, at *5 n.2 (D. Or. Sept. 19, 2013); *see also Crowell v. Astrue*, No. 3:11–cv–00094–HU, 2012 WL 6706023, at *8 n.3 (D. Or. Sept. 12, 2012) ("A GAF of 60 to 70 indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.'").

During a follow-up visit on June 20, 2007, Dr. Monteverdi noted that Keyser's "affect [wa]s bright" and that "[s]he continue[d] to look improved on the Zyprexa." (Tr. 318.) Keyser was seen by Dr. Jacobs the following day regarding her emphysema and pulmonary nodule. Dr. Jacobs noted that Keyser was "doing reasonably well," that she denied any increased breathlessness, chest pain, cough, or phlegm production, and that she continued to sing in her husband's rock-and-roll band. (Tr. 339.) Dr. Jacobs' examination revealed that Keyser's emphysema was "clinically stable," but noted that she remained a "high risk patient." (Tr. 339.)

On August 15, 2007, Keyser informed Dr. Monteverdi that she was running out of Zyprexa and having difficulty affording the appointments due to inadequate insurance and financial hardships. Dr. Monteverdi noted that Keyser had "been maintained quite stable on 15 [milligrams] of Zyprexa, as both the patient and her husband reflect[ed] on today." (Tr. 320.) Dr. Monteverdi therefore provided Keyser with six weeks' worth of Zyprexa samples.

On October 29, 2007, Dr. Monteverdi completed a medical source statement concerning the nature and severity of Keyser's mental impairments. Dr. Monteverdi described Keyser as "moderately" limited in seven of twenty categories of mental activity, and "mildly" limited in thirteen categories. Keyser was "moderately" limited in the following seven categories of mental functioning:

- The ability to understand and remember detailed (three or more steps) instructions or tasks which may or may not be repetitive;

- The ability to maintain attention and concentration for extended periods (the approximately two-hour segments between arrival and first break, lunch, second break, and departure) with four such periods in a workday;

Page 7 - FINDINGS AND RECOMMENDATION

- The ability to interact appropriately with the general public or customers;

- The ability to accept instructions and to respond appropriately to criticism from superiors;

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and

- The ability to respond appropriately to (a) expected, or (b) unexpected changes in the work setting.

In terms of work-related stressors, Dr. Monteverdi concluded that Keyser's level of impairment would be increased by "[u]nruly, demanding or disagreeable customers even on an infrequent basis," as well as "[a] need to make *quick* and accurate, independent decisions in problem solving on a consistent basis." (Tr. 345) (emphasis in original).

The next day, October 30, 2007, Keyser testified at a hearing before Administrative Law Judge John Madden, Jr. ("ALJ" or "ALJ Madden"). Keyser reported that she frequently experiences anxiety, paranoia, and shortness of breath, the latter of which requires her to take several breaks and sit down every half hour, and to nap two or three times daily for around one hour. Keyser testified that even the thought of making the bed is "exhausting." (Tr. 44.) She is unable to stand at a sink or stove for thirty minutes without taking breaks to sit down. She tries to go grocery shopping, but it is difficult for her to maneuver the cart and she becomes short of breath. She is afraid that if she leaves the house and walks down the street, she will not be able to make it back to the house.

Keyser also testified that she is aware she has "bubbles" on her lungs and a "big hole on this one side," and she is afraid if she does anything she will "pop" one of her lungs. (Tr. 33.) She testified that she sings in her husband's band and that the band practices approximately three times

a week, but that she is sitting down when she sings and is required to take many breaks because she gets winded by singing. She testified that the band had not played any "gigs" in a long time, and that the other band members are scared of her and only keep her around because her husband is the leader of the band. Keyser distinguished between singing with her husband's band a few times a week at home, and being able to work, noting that she is afraid of her lung "popping" anywhere outside her home. Because of her fear, she prefers to stay at home and does not like being around a lot of people.

Keyser's husband also testified at the hearing and confirmed that Keyser's depression and bipolar disorder had worsened after her lung collapsed. He further testified that she needs to lie down ninety percent of the day due to fatigue. He testified that prior to her lung collapse and hospitalization, Keyser was a hard worker who never called in sick and was very active. He testified that they never go out to dinner or to the movies, and that Keyser will accompany him to the grocery store on only one of every approximately fifteen trips, but she will wait in the car while he does the shopping.

Relying on opinions as to Keyser's limitations formulated by non-examining state agency consultants, ALJ Madden posed a hypothetical to a vocational expert ("VE1") who testified at Keyser's hearing. Specifically, he asked VE1 to assume that a hypothetical worker could lift twenty pounds occasionally and ten pounds frequently, could stand or walk no more than six hours in an eight-hour workday, and needed to avoid exposure to fumes, odors, dusts, gases, and poorly ventilated areas. VE1 testified that the hypothetical worker could not maintain Keyser's prior work as a grocery store cashier since the majority of the day would be spent standing, but the hypothetical worker could be employed as a different type of cashier, known as a Cashier I or II. Although the

Page 9 - FINDINGS AND RECOMMENDATION

Cashier I position is classified as a semi-skilled job, VE1 explained that the Cashier II position involves only unskilled, simple, and routine work. VE1 stated that there were 1.2 million cashier jobs in the national economy, including 43,000 positions in Oregon. However, the VE limited the Oregon-specific number to 12,696 positions based on Keyser's need to be sitting.

ALJ Madden asked VE1 how the "moderate" limitations identified by Dr. Monteverdi would impact the ability of a hypothetical worker's employment as a Cashier I or II.[6] VE1 testified that both occupations would be "ruled out, precluded," because the "moderate" limitations as defined by Dr. Monteverdi "would be very compromising for the work place." (Tr. 67.) VE1 further stated that if a "moderate" limitation is defined as a "slight" limitation, the limitations would not necessarily preclude employment in those positions, but that he is not equipped to opine on the impact of a combination of those limitations. (Tr. 68.)

On November 10, 2007, ALJ Madden issued a written decision finding Keyser not disabled and denying her claim for disability insurance benefits. The Appeals Council declined to review the ALJ's disability determination.

A year later, on October 27, 2008, Keyser appealed to the United States District Court for the District of Oregon, which subsequently affirmed the ALJ's denial of disability. *See Keyser v. Astrue*, No. 08-cv-01268-CL, 2010 WL 1027347 (D. Or. Mar. 18, 2010) (Panner, J.,) (adopting magistrate judge's recommendation to affirm the decision to deny benefits). Keyser's counsel filed a timely notice of appeal to the Ninth Circuit.

---

[6] Dr. Monteverdi's medical source statement defines "moderately limited" as "not totally precluded" in the performance of the designated work-related mental function, "but is substantially impaired in terms of speed and accuracy and can be performed only seldom to occasionally during an 8-hour workday, for example, for short durations lasting from 5 to 15 minutes not totaling more than 2 to 3 hours in an 8-hour workday." (Tr. 343.)

Page 10 - FINDINGS AND RECOMMENDATION

On January 31, 2011, Keyser was seen by Jared Plumb ("Plumb"), a medical school student working at Volunteers in Medicine ("VIM"), regarding her physical and mental impairments.[7] Keyser reported that she could "barely walk around the block without stopping intermittently to catch her breath," and that "her cough ha[d] become progressively more common and ha[d] now become a daily occurrence with sputum production." (Tr. 549.) Plumb noted that Keyser had long ago discarded a habit of smoking up to seventy packs of cigarettes per year.

Thereafter, Keyser continued to receive medical treatment and/or counseling on a near-monthly basis at VIM. A number of medical professionals at VIM treated Keyser, including Dr. W. Lawrence Campbell ("Dr. Campbell"), who drafted the following letter on Keyser's behalf:

> Mrs. Keyser is a . . . woman [in her mid-fifties] with Bipolar Disorder and Delusional Disorder who has recently developed Tardive Dykinesia secondary to her medication. She is totally unable to function, nevertheless, work in a stressful occupation. Her medication is having to be discontinued in an attempt to stop the Tardive Dyskinsesia [sic] and this will likely make her condition even worse.
>
> I am writing this appeal to SS[A] to seriously consider Mrs. Keyser's application for long term disability.

(Tr. 553; *see also* Tr. 528-29.)[8]

---

[7] A medical school student is not considered an "acceptable medical source" under the social security regulations. *See Ricci v. Apfel*, 159 F. Supp. 2d 12, 20 (E.D. Pa. 2001). However, when a so-called "other source" is "working closely with, and under the supervision of [an 'acceptable medical source'], [any] opinion is to be considered that of an acceptable medical source.'" *Taylor v. Comm'r Soc. Sec.*, 659 F.3d 1228, 1234 (9th Cir. 2011).

[8] The Court notes that Tardive Dykinesia is a permanent neurological disorder. *Lewis v. Waletzky*, 576 F. Supp. 2d 732, 733 (D. Md. 2008). The Court also notes that Dr. Campbell began treating Keyser about nine months prior to her date last insured, which is significant because Dr. Campbell's letter actually postdates Keyser's date last insured. *See generally Plummer v. Colvin*, No. CV–13–08282, 2014 WL 7150682, at *7 n.4 (D. Ariz. Dec. 16, 2014) ("To qualify for disability insurance benefits, a claimant must establish disability on or before her date last insured.") (citations omitted).

In a published opinion dated June 1, 2011, the Ninth Circuit held that ALJ Madden erred by failing to follow the requirements of 20 C.F.R. § 404.1520a, in determining whether Keyser's mental impairments were severe and, if severe, whether they met or equaled a listed impairment.[9] *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 727 (9th Cir. 2011). The Ninth Circuit reversed the judgment of the district court with instructions to remand to the ALJ to conduct a proper review of Keyser's mental impairments. *Id.*

Following remand to the Commissioner, Keyser appeared and testified at a second administrative hearing before ALJ Madden, on November 15, 2012. ALJ Madden instructed that Keyser's case was "back, basically, for [a] reevaluation of everything." (Tr. 379.) Keyser testified that she doesn't do much at all now. She tries to clean her home, but it is difficult for her because she cannot move anything around. Keyser also presented several medical records post-dating her first administrative hearing.

The principal focus of the second hearing, however, was the medical source statement prepared by Dr. Monteverdi on October 29, 2007. Keyser's counsel asked a VE ("VE2") to review Dr. Monteverdi's source statement and the definition of rating terms, such as "moderately limited." Keyser's counsel then asked VE2 whether a hypothetical worker would be able to perform the positions of Cashier I or II, assuming she was moderately limited in the ability to (1) interact

---

[9] "20 C.F.R § 404.1520a provides a framework for the ALJ to evaluate mental impairments. The ALJ must first evaluate pertinent symptoms, signs, and laboratory findings to determine if there is a medically determinable mental impairment. Then, the ALJ rates the degree of the claimant's functional limits in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. Finally, the ALJ determines whether the impairment is severe and, if so, whether it qualifies as a listed mental disorder." *Hinkle v. Astrue*, No. 09–CV-5105, 2010 WL 3238940, at *4 (N.D. Cal. Aug. 13, 2010) (internal citations omitted).

appropriately with the general public or customers; and (2) maintain attention and concentration for the two-hour periods between arrival and first break, lunch, second break, and departure. Both of these limitations were identified by Dr. Monteverdi in his medical source statement. Like VE1, VE2 also testified that these limitations would preclude the hypothetical worker from performing the positions of Cashier I or II.

Less than a month after the second hearing, on December 4, 2012, ALJ Madden issued a written decision finding Keyser not disabled and denying her application for disability insurance benefits.[10] The Appeals Council declined to review ALJ Madden's second disability determination, and Keyser timely appealed to the district court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser*, 648 F.3d at 724.  Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

---

[10] The ALJ's written decision dated December 4, 2012, is discussed in more detail *infra*, Part II.B.

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, then the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## B.    The ALJ's Decision

At the first step of the five-step sequential process, the ALJ found that Keyser "did not engage in substantial gainful activity during the period from her alleged onset date of October 31, 2005 through her date last insured of December 31, 2011."[11] (Tr. 355.) At the second step, the ALJ found that Keyser had the severe impairment of emphysema through the date last insured.[12]

---

[11] "To be eligible for disability insurance benefits under Title II, a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 1:07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based upon a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (internal citations omitted). Thus, Keyser's date last insured of December 31, 2011, reflects when her insured status terminated based on the prior accumulation of quarters of coverage.

[12] "[O]nly disabilities existing before [the] date last insured establish entitlement to disability insurance benefits." *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir.1984) (per curiam)).

At the third step, the ALJ found that Keyser's combination of impairments were not the equivalent of those on the Listing of Impairments. The ALJ then assessed Keyser's residual functional capacity ("RFC") and found that she could perform light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: (1) she can lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) she can push and/or pull twenty pounds occasionally and ten pounds frequently; (3) she can sit, stand or walk up to six hours in an eight-hour workday; (4) she needs to be able to alternate between sitting and standing positions; and (5) she needs to avoid even moderate exposure to respiratory irritants, such as dust fumes or gases. The ALJ also found that Keyser had no mental, postural or communication limitations. (Tr. 361.) In so finding, the ALJ gave "great weight to the opinion of the state['s]" non-examining medical and psychological consultants. (Tr. 366.)

At the fourth step, the ALJ noted that Keyser was unable to perform any past relevant work through the date last insured. At the fifth step, the ALJ found that there were jobs existing in significant numbers in the national economy that she could perform, including work as a Cashier I or II, in light of Keyser's age, education, work experience, and RFC (DOT 211.462-014 and DOT 211.462-010). Based on the finding that Keyser could perform jobs existing in significant numbers in the national economy, the ALJ concluded that Keyser was not under a disability, as defined under the Social Security Act, "from October 31, 2005, the alleged onset date, through December 31, 2011, the date last insured." (Tr. 370.)

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec.*

*Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).   Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097).   Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.*   However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Keyser argues that the ALJ: (1) improperly rejected the opinions of her treating physicians, Drs. Monteverdi, Knapp, and Jacobs; (2) failed to provide clear and convincing reasons for discrediting her subjective symptom testimony; (3) failed to fully credit the lay witness testimony provided by her husband, John Keyser; (4) failed to take into account all of her limitations in fashioning the RFC and VE hypothetical; and (5) improperly concluded that her bipolar disorder, depression, and anxiety disorder were non-severe impairments at step-two of the sequential evaluation process.

This Court agrees that the ALJ erred by improperly rejecting the opinions of Keyser's treating physicians, and by improperly discrediting Keyser's subjective symptom testimony and the

lay witness testimony of Keyser's husband.  In so doing, the ALJ failed to take into account all of Keyser's physical and mental health limitations, which resulted in a defective RFC and VE hypothetical.  The VE testimony from both hearings made it clear that if the limitations identified by Keyser's physicians are taken into account, she would not be able to perform the Cashier I or II occupations.  Accordingly, the Commissioner cannot meet her burden of proving that there were jobs existing in significant numbers in the national economy that Keyser could perform, which results in a finding that Keyser is disabled.  This Court recommends that the case be remanded for an immediate award of benefits.

## A.    Medical Opinions

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)).  To reject the opinion of a treating physician in favor of a conflicting opinion from an examining physician, "an ALJ still must 'make[ ] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Id.* (quoting *Thomas*, 278 F.3d at 957).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  But "[t]he ALJ must do more than state conclusions.

He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* Indeed, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

### 1.    Dr. Monteverdi

The ALJ discredited Dr. Monteverdi's medical opinions, but failed to provide legitimate reasons for doing so.

Dr. Monteverdi was Keyser's psychiatrist.  After a May 2007 assessment of Keyser, Dr. Monteverdi diagnosed Bipolar I current episode manic with some mild psychotic content, history of polysubstance abuse, and some paranoid and schizotypal traits.  Most important for this appeal is the ALJ's rejection of Dr. Monteverdi's medical source statement dated October 29, 2007:

> [Dr. Monteverdi] did indicate that the claimant had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public or customers; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; maintain socially appropriate behavior; and respond to unexpected changes in the work place.

> Dr. Monteverdi has not provided any medical rationale explaining why he believes that the claimant has the above-noted functional limitations. In fact, the claimant's successful work history, despite the bipolar diagnosis made years prior, contravenes all of the limitations he proposed related to interaction with others or even her ability to concentrate. The undersigned is not persuaded by the limitations Dr. Monteverdi checked off on the questionnaire. Furthermore, in October 2007, Dr. Monteverdi had not treated the claimant since August 2007.

(Tr. 359.)  The ALJ's rejection of Dr. Monteverdi's medical source statement is important, because it served as the basis for two separate VE hypotheticals that warrant a finding of disabled.

As an initial matter, the fact that Dr. Monteverdi's medical source statement postdates his last consultation with Keyser by two months should not discredit the opinion therein. The record does not support a conclusion that Keyser required no further treatment after August 2007. Rather, Keyser informed Dr. Monteverdi during a follow-up visit on August 15, 2007, that she could no longer afford treatment, and the record includes several references that corroborate Keyser's financial hardship. Indeed, Keyser's participation in mental health treatment significantly increased after she engaged services at VIM, a clinic that provides healthcare on a donation basis. Nor is there any evidence that Keyser's limitations changed between August and October 2007, and her continued limitations are corroborated by the VIM treatment notes post-dating the first administrative hearing. Thus, Keyser's failure to return to Dr. Monteverdi's office prior to the issuance of his medical source statement, or the fact that he submitted the statement two months after Keyser's last visit, are not valid bases for rejecting the opinions expressed therein.

The ALJ's reliance on Dr. Monteverdi's failure to provide "any medical rationale explaining why he believes" Keyser had the above-noted limitations is also unpersuasive. In *Garrison*, a recent Ninth Circuit opinion, a treating neurologist completed a questionnaire that posed a series of questions followed by check-boxes. 759 F.3d at 999-1001. Like here, the ALJ rejected the conclusions set forth in the questionnaire in favor of the conclusions of the state agency consultants based in large part on the neurologist's failure to provide any "rationale" for his medical conclusions. *Id.* at 1008. The Ninth Circuit concluded that the ALJ committed "a variety of egregious and important errors" in evaluating the neurologist's testimony, chief among them being the ALJ's failure "to recognize that the opinions expressed in the check-box form . . . were based on significant experience with [the claimant] and supported by numerous records[.]" *Id.* at 1013.

Page 19 - FINDINGS AND RECOMMENDATION

These opinions "were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." *Id.*

So too here. Dr. Monteverdi treated Keyser for several months and the medical records from those visits support the opinions set forth in Dr. Monteverdi's medical source statement. For example, as the ALJ acknowledged, Dr. Monteverdi "noted that in the last six months, the claimant had some expansive and irritable affect, some flight of ideas, and a volatile mood." (Tr. 357.) Dr. Monteverdi contemporaneously noted that "she occasionally will get mixed episodes and it does appear that's what she's in the midst of now as she has mild feelings of hopelessness." (Tr. 357.) Dr. Monteverdi also made observations that touch upon Keyser's ability to maintain concentration and attention, noting that Keyser "has significant flight of ideas [which makes it] difficult to get any sort of linear answer from her," "[h]er thought process is tangential," and "[h]er insight is fair to poor[.]" (Tr. 314, 316.)

Moreover, Dr. Monteverdi's Initial Psychiatric Assessment included a GAF score of 55 to 65, suggesting mild to moderate symptomatology. Importantly, the low end of Keyser's GAF range would be marked by "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *DeFalco-Miller v. Colvin*, 520 F. App'x 741, 743 n.1 (10th Cir. 2013). Dr. Monteverdi's description is consistent with the descriptions of Keyser in the testimony and medical evidence of record, as well as the letter drafted by Dr. Campbell in support of Keyser's application for disability benefits, all of which further corroborate Dr. Monteverdi's opinion.

Finally, the ALJ's reliance on Keyser's "successful work history, despite the bipolar diagnosis made years prior," as a ground for rejecting "all of the limitations" contained in Dr. Monteverdi's medical source statement, is misplaced. Dr. Monteverdi issued his medical source statement two years after Keyser's lung collapsed and she stopped working at Fred Meyer. In rejecting the limitations identified by Dr. Monteverdi's opinion, the ALJ ignored substantial evidence in the record demonstrating that Keyser's mental health had deteriorated following her separation from employment at Fred Meyer. Thus, the ALJ's conclusion that Keyser must have no limitations because she did not have those limitations prior to her collapsed lung, hospitalization, and recovery, misses the point.

The record supports a finding that following Keyser's separation from Fred Meyer, her mental health deteriorated. Dr. Monteverdi's August 15, 2007 progress note indicates that Keyser was experiencing some "difficulties with her type I bipolar disorder as well some paranoid and schizotypal personal traits," and that the absence of Zyprexa "ha[d] been tremendously bad."[13] (Tr. 320.) These notations were based, in part, on reports from Keyser's husband. Keyser's husband prepared a Third-Party Adult Function report, wherein he stated: "[b]efore her [lung] injury, [my wife] was having problems w[ith] depression [and] bipolar disorder at work [and] at home. After her diagnosis of emph[ys]ema and then her collapsed lung . . . [s]he now is extremely afraid of lifting[,] using [the] restroom, [and] being alone because of possibilities of another injury." (Tr. 161.) The ALJ's written decision indicates that he found "Mr. Keyser's reporting [wa]s credible." (Tr. 365.)

---

[13] "According to the accepted diagnostic criteria, schizotypal personality disorder is characterized by a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior." *United States v. Long*, 562 F.3d 325, 335 (5th Cir. 2009) (citation omitted).

Page 21 - FINDINGS AND RECOMMENDATION

Keyser also testified about her increased anxiety following her collapsed lung, because she constantly feared her lung would "pop" again.

The ALJ improperly substituted his own opinion for the opinion of Dr. Monteverdi, without a legitimate basis, and erred in so doing. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("[T]he ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

### 2.    Dr. Jacobs

The ALJ also impermissibly discredited Dr. Jacobs' opinion, without a legitimate basis.

Dr. Jacobs was Keyser's pulmonologist. It was Dr. Jacobs' medical opinion, based on his treatment of Keyser, that Keyser was suffering from "severe" emphysema with significant exercise limitation, and that as a result, she was not able to work with any kind of strenuous activity. (Tr. 305.) He also recommended a disability finding based on "the severity of her bullous emphysema" and her pre-bronchodilator score, as well as his conclusion that she is at risk for a recurrent collapsed lung. (Tr. 312.)

The ALJ gave Dr. Jacobs' opinion that Keyser would not "be able to work with any kind of strenuous activity" little weight, because in the opinion of the ALJ, her RFC "did not require [her] to perform strenuous activity." (Tr. 364.) Dr. Jacobs did not describe "strenuous" activity in his opinion, but it was necessarily particularized to what he considered to be "strenuous" for Keyser's condition. Keyser's husband testified at the first hearing that his wife needed to lie down ninety percent of the day due to fatigue. Assuming Keyser's husband is an accurate historian, as the ALJ did, any activity requiring more exertion than lying down ninety percent of the day would be strenuous for Keyser. Thus, Dr. Jacobs' opinion that Keyser was unable to work with any kind of

strenuous activity is corroborated by testimony, and an RFC requiring Keyser to stand or walk up to six hours in an eight-hour workday is inconsistent with both Dr. Jacobs' opinion and credible testimony.

The ALJ also rejected Dr. Jacobs' conclusion that Keyser was disabled on the ground that "his own testing results showed that she did not have significant deficits, as [Dr. Jacobs] suggested." (Tr. 365.)  The ALJ based this conclusion on the fact that Keyser had a pre-bronchodilator FEV1 of forty-six percent and post-bronchodilator FEV1 of seventy-two percent on December 26, 2006, yet the letter Dr. Jacobs issued the following day only referred to the pre-bronchodilator FEV1 of forty-six percent.

That Dr. Jacobs, a pulmonary specialist, chose to place more emphasis on Keyser's pre-bronchodilator FEV1, should not discredit his conclusions.  On the contrary, a pulmonary specialist is in a better position to appreciate the medical significance of a pre-bronchodilator score, even if a patient's score improves post-bronchodilator.  In addition, Dr. Jacobs' later treatment notes indicating that Keyser's severe emphysema was "clinically stable," merely indicated her emphysema was not getting worse, not that it no longer presented limitations.  In the same progress note, he referred to Keyser as a "high risk patient."  Indeed, there is nothing in the record to suggest that the original prognosis of a thirty percent or above recurrence rate of a collapsed lung improved over time.

In sum, the ALJ rejected Dr. Jacobs' interpretation of the medical data in favor of his own interpretation, and he erred in so doing.  *See Ferguson*, 765 F.2d at 37 ("[T]he ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

///

Page 23 - FINDINGS AND RECOMMENDATION

**3.     Dr. Knapp**

The ALJ also erred by ignoring Dr. Knapp's medical opinion that Keyser was limited by a combination of her emphysema and her mental health limitations.

Dr. Knapp was Keyser's primary treating physician, and was in a unique position to assess both Keyser's physical health limitations as well as her mental health limitations. In June 2006, he described Keyser's "severe emphysema" diagnosis, noted her recent surgery, hospitalization and lengthy recovery, and noted the diagnosis that Keyser has several other "blebs" in her lung tissue that could rupture and require additional treatment. (Tr. 306.) In light of those medical findings, Dr. Knapp opined that Keyser is "clearly unable to perform any work because of it." (*Id.*) In November 2006, Dr. Knapp noted that in addition to emphysema, Keyser is also suffering from severe depression and a generalized anxiety disorder. (Tr. 307.) It was Dr. Knapp's opinion that, "due to the combination of these impairments," Keyser is unable to work. (*Id.*)

As an initial matter, the Court agrees with the ALJ that whether a claimant is "disabled" under Social Security regulations, and the availability of jobs, and are opinions reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). The Court also agrees that it was proper for the ALJ to disregard Dr. Knapp's opinion expressed during Keyser's follow-up visit on December 8, 2005, that Keyser "certainly should qualify for" disability insurance benefits. (Tr. 224.) That conclusion is outside the province of a treating physician.

However, the ALJ erred in giving *no* weight to the other aspects of Dr. Knapp's medical opinion. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (noting that medical source opinions about whether an individual is "disabled" or "unable to work" are administrative findings reserved to the Commissioner, but noting that "[s]uch opinions on these issues must not be

Page 24 - FINDINGS AND RECOMMENDATION

disregarded."). The ALJ took issue with Dr. Knapp's conclusion that Keyser could not work because "later diagnostic testing showed that [Keyser] responded remarkably well on FEV1 testing results, post-bronchodilator[.]" (Tr. 364.)[14]  However, the ALJ ignored that Dr. Knapp was in a unique position, as a primary care treatment provider, to assess the limitations caused by the combination of Keyser's emphysema *and* her mental health issues.  The Ninth Circuit has recognized that "the treating physician's opinion as to the combined impact of the claimant's limitations—both physical and mental—is entitled to special weight." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995).  Indeed,

> [a]n integral part of the treating physician's role is to take into account all the available information regarding all of his patient's impairments . . . [and] [t]he treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information the provide, and to form an overall conclusion as to functional capacities and limitations . . . .

*Id.*; *see also* 20 C.F.R. § 404.1527(d)(2) (recognizing that treating physicians bring a "unique perspective to the medical evidence").

Here, the ALJ disregarded Dr. Knapp's opinion in part because a chest x-ray showed Keyser's emphysema was medically stable around the time Dr. Knapp issued his first letter in support of Keyser's application for benefits.  However, that chest x-ray did not alter Dr. Knapp's medical opinion, and it was improper for the ALJ to second guess the medical opinion of Keyser's treating physician.  Furthermore, Mr. Knapp's opinion that Keyser was unable to perform any work was based not only on her severe emphysema, but also on her risk of another collapsed lung due to

---

[14] The ALJ also noted that he rejected Dr. Knapp's opinion in part because Dr. Knapp is not an expert in the types of work that might be available to an individual who suffers from the claimant's impairments. The Commissioner has conceded that the ALJ erred to the extent he rejected Dr. Knapp's opinion on that ground.  (Def.'s Br. at 12.)  This Court agrees.

the "blebs" that remained in her lung tissue, combined with the limitations presented by her mental

health issues.  An ALJ "must give sufficient weight to the subjective aspects of a doctor's opinion,"

*Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988), but the ALJ failed to do so here.

**B.    Adverse Credibility Determination**

The Court further concludes that the ALJ failed to provide sufficient reasons for rejecting

Keyser's subjective symptom testimony.  Under Ninth Circuit case law,

> [w]ithout affirmative evidence showing that the claimant is malingering, the [ALJ]'s
> reasons for rejecting the claimant's testimony must be clear and convincing.  If an
> ALJ finds that a claimant's testimony relating to the intensity of his pain and other
> limitations is unreliable, the ALJ must make a credibility determination citing the
> reasons why the testimony is unpersuasive. The ALJ must specifically identify what
> testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted).  Clear

and convincing reasons for rejecting a claimant's testimony "include conflicting medical evidence,

effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or

between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and

testimony from physicians and third parties about the nature, severity and effect of the symptoms

complained of."  *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25,

2012); *Ramirez v. Comm'r. Soc. Sec. Admin.*, No. 09–684–KI, 2010 WL 4683847, at *20 (D. Or.

Nov. 10, 2010) (same).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of

credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

concerning the symptoms, and other testimony by the claimant that appears less than candid," and

(2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas*, 278 F.3d at 959.

Given the absence of any evidence showing that Keyser is malingering, the ALJ was required to provide clear and convincing reasons for discrediting her symptom testimony. The ALJ rejected Keyser's testimony based on his findings that Keyser's daily activities were inconsistent with the alleged symptoms, and conflicting medical evidence. The ALJ was particularly troubled that Keyser sings in a rock-and-roll band approximately three times a week, performs self-care activities independently, shops in stores, cleans her house, and prepares meals. In addition, the ALJ determined that Keyser's testimony was contradicted by the medical evidence, citing treatment records that showed improvement with bronchodilator treatment and general stability in 2006 and 2007.

Based upon its review of the record, this Court concludes that the ALJ's adverse credibility determination is not supported by substantial evidence. First, Keyser's daily activities were not inconsistent with her proffered symptoms. "Daily activities may . . . be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of h[er] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Ghanin v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (citation and quotation marks omitted). In this case, there is no indication that the limited activities Keyser engaged in comprised anywhere near a "substantial" portion of her day. At first glance, Keyser's ability to sing in her husband's band belies a finding of disability. However, upon careful examination of the record, it is clear that Keyser's participation in the band was very limited, that she took at least three breaks during two-

hour practice sessions, that she must sit down during the practices, and that sometimes she could not complete a practice. (Tr. 27-35.) "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits[.]" *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Second, when read as a whole, the treatment records do not undermine Keyser's testimony. *See Ghanin*, 763 F.3d at 1164 (noting, in the context of an adverse credibility analysis, that "treatment records must be viewed in light of the overall diagnostic record."). Instead, the treatment records reveal that Keyser experienced considerable difficulty with everyday activities. Keyser's testimony about her limitations was corroborated by her treating physicians, as well as her husband's credible reporting. Accordingly, this Court concludes that the ALJ erred by discrediting Keyser's subjective symptom testimony.

### C.    Lay Witness Testimony

The ALJ also erred by improperly discrediting the lay witness testimony of John Keyser. In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence that cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). Inconsistencies between the lay witness's testimony and the claimant's presentation to her treating physicians or activities of daily living is another reason. *Barber v. Astrue*, No. 1:10–cv–01432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

In his second written decision, the ALJ found John Keyser's reporting was credible, but that his testimony did not influence the ALJ's findings:

Page 28 - FINDINGS AND RECOMMENDATION

> The undersigned finds that Mr. Keyser's reporting is credible, but does not change the conclusion that the claimant is capable of returning to work. . . . Mr. Keyser's hearing testimony was compelling regarding the claimant's strong work ethic. However, there is an absence of treatment records suggesting that her conditions precluded her ability to return to work within the restrictions noted above [in the RFC] prior to December 31, 2011[, the date last insured].

(Tr. 365.)

As a threshold matter, the Commissioner contends "that just because the ALJ believes the [lay] witness to be honest and truthful does not make the witness's testimony competent evidence." (Def.'s Br. at 7.) That is incorrect. As the Ninth Circuit explained in *Stout*, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence . . . and therefore *cannot* be disregarded without comment. Consequently, if the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." 454 F.3d at 1053 (citation, quotation marks, and brackets omitted) (emphasis in the original).

There is no substantial evidence in the record to support the ALJ's suggestion that Mr. Keyser's testimony is inconsistent with the treatment records. Unlike the non-examining state agency physicians, Keyser's treating physicians' records and opinions support Mr. Keyser's testimony, as discussed above. The ALJ failed to point to any specific examples that contradicted Mr. Keyser's credible reporting. The Court thus concludes that the ALJ erred by failing to provide any specific, germane reason for disregarding John Keyser's testimony. *Cf. Cothrell v. Colvin*, No. 3:13–cv–00276–HA, 2014 WL 879347, at *4 (D. Or. Mar. 5, 2014) ("The ALJ's decision was not consistent with the lay witnesses [sic] testimony, and he did not provide any [legally sufficient] reason to reject either's opinion. Therefore, this court finds that the ALJ erred in his consideration of the lay witness testimony of plaintiff's mother and sister.").

Page 29 - FINDINGS AND RECOMMENDATION

**D.      The RFC and VE Hypothetical**

"The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'"  *Valentine*, 574 F.3d at 690 (quoting *Embrey*, 849 F.2d at 422).  Therefore, "an RFC that fails to take into account a claimant's limitations is defective."  *Id*.

The ALJ concluded in his RFC finding, among other things, that Keyser could sit, stand, or walk up to six hours in an eight-hour workday, had no communication limitations, and had no mental limitations.  The RFC was defective because it ignored the medical opinions of Drs. Monteverdi, Jacobs, and Knapp, and failed to credit Keyser's testimony, corroborated by that of her husband, regarding Keyser's limitations.  Instead, the ALJ relied on the opinions of the state agency physicians, who were privy only to a few months of medical records from late 2005 and early 2006, and failed sufficiently to consider the testimony post-dating the first administrative hearing.  Most notably, Keyser's RFC failed to account for Dr. Monteverdi's opinion that Keyser was "moderately" limited in the ability to (1) interact appropriately with the general public or customers; and (2) maintain attention and concentration for the two-hour periods between arrival and first break, lunch, second break, and departure.  Although her mental health impairments did not satisfy listings 12.04 or 12.06, those limitations were still relevant to Keyser's RFC, and the ALJ's conclusion that Keyser had "no mental limitations" was error. *See Russell v. Sullivan*, 930 F.2d 1443, 1455 (9th Cir. 1991) ("Hypothetical questions posed to a vocational expert must set out *all* the limitations and restrictions of the particular claimant, including . . . an inability to engage in certain activities.  If the assumptions in the hypothetical are not supported by the record, the vocational expert's opinion that

a claimant is capable of working has no evidentiary value.") (citations omitted), *abrogated on other grounds in Sorenson v. Mink*, 239 F.3d 1140, 1149 (9th Cir. 2001).

As a result of the defective RFC, the ALJ improperly instructed the vocational expert. When VE1 considered Dr. Monteverdi's findings, VE1 testified that Cashier I and II would be ruled out. (Tr. 67) (the "moderate" limitations identified by Dr. Monteverdi "would be very compromising for the work place"). When VE2 was presented with a hypothetical that considered Dr. Monteverdi's findings, VE2 also testified that the hypothetical worker would *not* be able to perform the positions of Cashier I or II. As a result, this Court finds that the Commissioner cannot meet her burden at step-five.

**E.    The Credit-as-True Rule**

"After finding the ALJ erred, this court applies a three part test to determine whether the case should be remanded for further proceedings, or to calculate and award benefits." *Mahmood v. Comm'r Soc. Sec. Admin.*, No. 3:13–cv–01598–MA, ---- F. Supp. 3d ----, 2014 WL 5261337, at *8 (D. Or. Oct. 14, 2014). Remanding for an immediate award of benefits is appropriate when the following three conditions are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose, (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* (quoting *Garrison*, 759 F.3d at 1020). If, however, the district court's review of the record as a whole raises "serious doubts" about whether the claimant is actually disabled, it may exercise its discretion and remand for further administrative proceedings. *Id.*

Remand for an immediate aware of benefits is appropriate in this case.  First, the record has already been fully developed and a third round of administrative proceedings is unnecessary. Second, the ALJ failed to provide legally sufficient reasons for discrediting Keyser's testimony and rejecting the opinions of Drs. Monteverdi and Jacobs.  The ALJ also failed to provide any reason for failing to treat John's Keyser's testimony as competent evidence.  Third, and finally, if Dr. Monteverdi's opinion is credited as true, the ALJ would be required to find Keyser disabled based on the testimony elicited from the vocational experts at both hearings.  Given the absence of "serious doubts" about whether Keyser is disabled, the Court recommends remand for an immediate award of benefits.[15]

## V. CONCLUSION

For the reasons stated, the Court recommends that the Commissioner's decision be reversed and remanded for an immediate award of benefits.

///

///

///

///

///

///

///

///

///

_____

[15] In light of the foregoing, the Court declines to address any remaining assignment of error.

Page 32 - FINDINGS AND RECOMMENDATION

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 2nd day of March, 2015.

/s/ Stacie F. Beckerman
STACIE F. BECKERMAN
United States Magistrate Judge